## RAYNOR v. UNITED STATES.

### FOWLER v. SAME.

Nos. 6096, 6097.

Circuit Court of Appeals, Seventh Circuit.
March 23, 1937.

Rehearing Denied May 11, 1937.

LINDLEY, District Judge, dissenting.

George R. Jeffrey, of Indianapolis, Ind., and John Elliott Byrne, of Chicago, Ill., for appellants.

Val Nolan, U. S. Atty., and B. Howard Caughran and Paul A. Pfister, Asst. U. S. Attys., all of Indianapolis, Ind.

EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

BRIGGLE, District Judge.

The defendants were convicted in the District Court under the second count of an indictment charging that they "on or about the 9th day of October, 1936, after a distinctive paper had been adopted by the Secretary of the Treasury of the United States for the obligations and other securities of the United States, did then and there unlawfully, wilfully, knowingly and feloniously have in their possession * * * similar paper adapted to the making of such obligations and other securities, without the authority of the Secretary of the Treasury or any other proper officer of the United States." Defendants prosecute separate appeals, but as the same questions are involved in each they will be disposed of in one opinion.

The section of the statute under which defendants were convicted (Cr.Code § 150, 18 U.S.C.A. § 264) consists of one sentence, separated into seven distinct subdivisions by semicolons. It is the last of these seven subdivisions with which we are here concerned, but for a better understanding the entire section is appended in the margin.* That portion here involved

---

* § 264. (Criminal Code, section 150.) *Using plates to print notes without authority; distinctive paper.* Whoever, having control, custody, or possession of any plate, stone, or other thing, or any part thereof, from which has been printed, or which may be prepared by direction of the Secretary of the Treasury for the purpose of printing, any obligation or other security of the United States, shall use such plate, stone, or other thing, or any part thereof, or knowingly suffer the same to be used for the purpose of printing any such or similar obligation or other security, or any part thereof, except as may be printed for the use of the United States by order of the proper officer thereof; or whoever by any way, art, or means shall make or execute, or cause or procure to be made or executed, or shall assist in making or executing any plate, stone, or other thing in the likeness of any plate designated for the printing of such obligation or other security; or whoever shall sell any such plate, stone, or other thing, or bring into the United States or any place subject to the jurisdiction thereof, from any foreign place, any such plate, stone, or other thing, except under the direction of the Secretary of the Treasury or other proper officer, or with any other intent, in either case, than that such plate, stone, or other thing be used for the printing of the obligations or other securities of the United States; or whoever shall have in his control, custody, or possession any plate, stone, or other thing in any manner made after or in the similitude of any plate, stone, or other thing, from which any such obligation or other security has been printed, with intent to use such plate, stone, or other thing, or to suffer the same to be used in forging or counterfeiting any such obligation or other security, or any part thereof; or whoever shall have in his possession or custody, except under authority from the Secretary of the Treasury or other proper officer, any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same; or whoever shall print, photograph, or in any other manner make or execute, or cause to be printed, photographed, made, or executed, or shall aid in printing, photographing, making, or executing any engraving, photograph, print, or impression in the likeness of any such obligation or other security, or any part thereof, or shall sell any such engraving, photograph, print, or impression, except to the United States, or shall bring into the United States or any place subject to the jurisdiction thereof, from any foreign place, any such engraving, photograph, print, or impression, except by direction of some proper officer of the United States; or whoever shall have or retain in his control or possession, after a distinctive paper has been adopted by the Secretary of the Treasury for the obligations and other securities of the United States, any similar paper adapted to the making of any such obligation or other security, except under the authority of the Secretary of the Treasury or some other proper officer of the United States, shall be fined not more than $5,000, or imprisoned not more than fifteen years, or both. (R.S. § 5430; Mar. 4, 1909, c. 321, § 150, 35 Stat. 1116.)

provides that "whoever shall have or retain in his control or possession, after a distinctive paper has been adopted by the Secretary of the Treasury for the obligations and other securities of the United States, any similar paper adapted to the making of any such obligation or other security, except under the authority of the Secretary of the Treasury or some other proper officer of the United States."

The pertinent facts are without substantial dispute and are as follows: The Secretary of the Treasury of the United States adopted in 1928 a distinctive paper for the printing of government obligations and securities, which was a high grade rag bond paper with short, fine, red and blue silk fibers impregnated. The silk fibers are placed in the pulp and distributed throughout the paper at the time of manufacture and are visible to the eye after the paper is manufactured and after the currency or obligations are printed. This distinctive paper is manufactured for the government under a contract with a private concern upon an ordinary paper machine. As it comes from the machine it is put under government guard, cut to the size specified, put in sealed cases and delivered under guard to Bureau of Printing and Engraving of the Treasury Department.

The defendants were found in possession of a small piece of paper, introduced in evidence as Government's Exhibit 3, which was a high grade bond paper, cut the size of ordinary currency and approximately the same color, weight, thickness and opacity as the "distinctive" government paper. It "rattled" very much the same on crushing, had small, irregular red and blue lines on the surface (apparently pencil marks) made to imitate the red and blue silk fibers of the genuine, but did not in fact contain red and blue silk fibers. The record contains proof of many other facts concerning the maneuvers of defendants in an attempt to either produce counterfeit currency or to swindle other persons who might be willing to join them in some such unlawful scheme, all of which may have been pertinent to another count of the indictment on which the court directed a verdict of not guilty, but have no direct bearing upon the count now before us and need not be detailed.

The decision turns upon the construction to be given the statute and particularly the word "similar" and the phrase "adapted to the making of any such obliga-tion or other security." Appellants contend that the paper, the possession of which is prohibited by the statute is paper similar to the distinctive paper adopted by the Secretary of the Treasury and adapted to the making of genuine government obligations and securities. The District Attorney contends that the paper contemplated by the statute is paper, which if printed as a counterfeit obligation, would pass as currency in the general trade of the United States. Appellants assert that the test is not whether it would pass as currency in the general trade of the country, but whether it is in fact adapted to the making of valid government obligations.

Webster defines the word "similar" to mean "nearly corresponding, resembling in many respects, somewhat like." Winston's simplified dictionary says, "having a more or less marked resemblance or correspondence to one another or to something else, analogous, like but not exactly the same, of the same nature."

We think that "similar" does not import "exactly alike" but is to be understood in its usual and ordinary meaning of having a "marked resemblance" to, or of the same general nature, degree or order. Under the facts, therefore, we think a jury was justified in saying that the paper in question was similar to the genuine government paper. This, however, is not sufficient—it must also be "adapted to the making of any such obligation or other security."

The recognized authorities define the transitive verb adapt to mean, to make suitable; cause to conform; make fit by alteration. They define the adjective adaptable to mean, easily fitted or made suitable; easily and quickly able to conform to new or strange circumstances; that can be adapted or can easily adapt itself. The word "adapted" is not specifically defined in the authorities but is the past tense of the transitive verb "adapt." Following through the meaning of the verb it may be said to indicate that the object referred to has been made suitable; has been made to conform to; has been made fit by alteration.

The government urges a construction of the word "adapted" as though it means the same as "adaptable"—easily made suitable. It is to be noted, however, that Congress has chosen the word "adapted" and we cannot agree that it is synonymous with "adaptable." Rather, we

think that it should be accorded its ordinary and commonly accepted meaning to connote something that has already been made fit for the purpose indicated. An application of this meaning indicates that Congress had in mind paper that *had been* made fit or suitable to the making of such obligations or securities and not paper that *could be* made fit or that was adaptable.

The words "such obligation or other security" are also involved. We think such words refer back to the genuine obligations and securities of the United States. These are the plain words of both the statute and the indictment. The defendants were not charged with possessing paper adapted to the making of counterfeit currency that might reasonably be expected to pass in the trade of the country, but were charged with possessing paper adapted to making genuine obligations of the United States. Under the facts the paper they possessed cannot be said to be adapted to the making of genuine obligations because it does not contain at least one feature of the "distinctive paper" adopted by the government, in that it contains no red and blue silk fibers. We think the argument of the District Attorney is directly in the face of the plain words of the statute. There is nothing in the act to indicate that Congress was undertaking to outlaw possession of the numerous kinds of high grade bond paper that might reasonably be said to be "similar" to that officially adopted by the government but rather, we think, they were striking at the evil of someone unlawfully coming into possession of the genuine government paper. This is further borne out by the language of the act "except under the authority of the Secretary of the Treasury or some other proper officer of the United States." No one would have occasion to request or receive authority from such public officials to possess any paper unless it were the genuine paper of the government. The Secretary of the Treasury would scarcely be called upon to grant authority to one to. possess paper adapted only to the making of spurious obligations. Otherwise every manufacturer, merchant, or printer, making, dealing in, or using the higher grade bond paper similar to that adopted by the government would be required under the terms of this act to gain the permission of the Secretary of the Treasury to lawfully possess such paper. No such situation was, of course, contemplated by Congress unless such pa-

per is at the same time adapted to the making of such genuine obligations. Under the evidence before us much of the better grades of bond paper is so adapted except for the absence of the red and blue silk fibers.

On the other hand, occasions arise where the Secretary of the Treasury may feel obliged to grant authority to some person to possess the genuine government paper. A chemist from the Bureau of Engraving and Printing appeared as a witness for the government in the instant case and produced as an exhibit what he testified was the genuine paper upon which the government prints its twenty dollar bills. For him to thus possess and produce the prohibited paper became lawful only by virtue of the authority granted him under this provision of the act. We thus have a concrete application of this clause which gives it a meaning harmonious with the construction contended for by appellants.

It is to be noted that the bare *possession* of the prohibited paper completes the offense defined in the statute. It need not be possessed with the intent to counterfeit the obligations of the United States, and it need not be put to any other use. Not so with the offenses defined in the preceding paragraphs of the same section. In the first paragraph it is the *use* of the prohibited article; in the second it is the *making* of a plate in the likeness of a government plate; in the third it is the *selling* or *bringing into* the United States of any prohibited plate with the *intent* that it be used for a purpose other than the printing of government obligations; in the fourth, it is the possession of the prohibited plate with *the intent to use* in counterfeiting such obligations; in the fifth, it is the having possession of a *spurious obligation* with the *intent* to sell or use same; in the sixth, it is the *making* or *selling* of the prohibited article. In the seventh paragraph, however, which is the one under consideration, it is the *possession* of paper similar to that adopted by the government and adapted to the making of government obligations that is made the offense. Paper of the kind possessed by the defendants is in common use—it is on sale by every dealer and is possessed by thousands of citizens. Paper of the kind used by the government in printing currency is of a distinctive type in that it has impregnated red and blue silk fibers, a feature not present in commercial paper.

It is not for sale by any merchant and cannot lawfully be purchased or possessed except by authority of the Secretary of the Treasury or other proper officer. It is faithfully guarded by the government from the moment of its manufacture until it is released for circulation as government obligations. Obviously it was the possession of paper, thus suitable for and adapted to the making of the genuine obligations that Congress was outlawing. It is freely conceded that the paper in question contained no such fibers. That some one had caused red and blue pencil marks to be placed upon the paper in an effort to simulate the genuine is immaterial so far as the offense charged in the second count of the indictment is concerned. It does not require an expert to observe at a single glance that such markings are not red and blue silk fibers.

So far as we are advised this particular clause of the section under consideration has been before but one other Court of review. The Second Circuit in the case of Krakowski v. United States (C.C.A.) 161 F. 88, 89 (decided in 1908), had occasion to consider the same provision and there said: "The statute contemplates the adoption by the Secretary of the Treasury of a distinctive paper for government obligations, and provides that it shall be unlawful, without authority from the Secretary or other proper official, to possess any paper similar to the distinctive paper and likewise adapted to the making of government securities. A paper which resembles the distinctive paper and also is of such character as to be suitable for the imprint of government obligations comes precisely within the terms of the statute. * * * The words 'adapted to the making of such obligations' clearly refer to the obligations of the United States just before mentioned in the statute. There is no room for reading anything else into the statute and no basis for doing so. Nothing indicates that Congress had in mind the possession of the many kinds of paper adapted to the making of counterfeit money, especially poor counterfeits."

We are in accord with this reasoning and believe that under the undisputed evidence here the defendants were not guilty of the offense defined by the statute and charged in the second count of the indictment. There has been a misapprehension of the proper section of the statute applicable to the facts herein.

The judgment is reversed and the cause remanded.

Reversed and remanded.

LINDLEY, District Judge (dissenting).

The statutory construction adopted, it seems to me, is strained and over-literal and does violence to the intent of Congress. That legislative body, manifestly, was dealing with the possession of articles capable of use in counterfeiting obligations of the United States which might deceive the ordinary citizen to whom such counterfeits might come. Thus we find condemned "plates, stones or other thing," in the possession of any one other than the government, adapted or capable of being used in counterfeiting. We find condemned also engravings, photographs, prints, or impressions of similar character and paper "similar" to official paper, "adapted to the making of any such obligation." The evil in all these sought to be reached lies, not in their use in making bona fide obligations, but in their quality of being susceptible of improper use in making plausible counterfeit obligations, such as might readily deceive the public.

So the construction adopted rightfully concludes that the condemned paper need not be "exactly like" official paper. But to me the forbidden article was meant to include all fabrications of such similitude to official paper as, when used, might easily deceive, not the expert, but every day business men or other citizens amongst whom the criminal hopes to circulate counterfeits. The paper in question is included within such rule.

Nor can I agree that it is plainly discernible that the blue and red tracings are superficial pencil marks. After careful examination of the marks with the aid of a magnifying glass, I am wholly uncertain as to whether they are woven in the fabric or traced. Citizens, among whom counterfeits circulate, do not ordinarily use magnifying glasses. I think the judgment should be affirmed.